# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chris Gates and Stephen Pascal, :
Appellants :
:
v. : No. 495 C.D. 2019
: Argued: October 3, 2019
City of Pittsburgh Planning :
Commission, City of Pittsburgh and :
East Ohio Capital Group, and East :
Ohio Capital LLC :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE ELLEN CEISLER, Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER[1]                    FILED: June 12, 2020


Chris Gates and Stephen Pascal (Objectors) appeal from the Order of the Court of Common Pleas of Allegheny County (common pleas) that affirmed the City of Pittsburgh Planning Commission's (Commission) October 12, 2018 approval of East Ohio Capital LLC's (East Ohio Capital) proposed lot consolidation and subdivision plan (Plan). On appeal, Objectors argue that the Commission erred and abused its discretion in approving the Plan because East Ohio Capital did not establish all of the requirements needed for the Plan's

---

[1] This opinion was reassigned to this author on May 8, 2020.

approval and a Commission member should have recused herself from considering the Plan. Discerning no error or abuse of discretion, we affirm.

## I. Background

### A. *The Plan*

East Ohio Capital owns parcels located at 706-712 Cedar Avenue in the City of Pittsburgh's (City) East Allegheny neighborhood that are improved with single-family residential buildings and are zoned R1A-VH (Residential Single Family – Very High Density). (Comm'n Decision, Finding of Fact (FOF) ¶ 8; Reproduced Record (R.R.) at 165.[2]) A local organization known as the Northside Leadership Council (NLC) owns the parcels located at 406-410 East Ohio Street that are improved with two, three-story commercial buildings and are zoned Local Neighborhood Commercial (LNC). The Plan proposed to consolidate and subdivide these eight lots into five lots, with a 5.6-foot strip of land from one of the R1A-VH properties being incorporated into the rear of the LNC property at 406-410 East Ohio Street. The Plan rearranged the parcels' dimensions as follows: Lot 1, covering 3246 square feet, would have 50.15 feet of frontage along East Ohio Street and 118.82 feet of frontage along Moravian Way;[3] Lot 2, covering 1456 square feet, would have 15.01 feet of frontage along Cedar Avenue and 11.33 feet of frontage along Moravian Way; Lot 3, covering 1500 square feet, would have 15.27 feet of frontage along Cedar Avenue and 11.33 feet of frontage along Moravian Way; Lot 4, covering 1549 square feet, would have 14.4 feet of frontage

---

[2] The reproduced record does not use an "a" after the page numbers as required by Pennsylvania Rule of Appellate Procedure 2173, Pa.R.A.P. 2173.

[3] Moravian Way is an alley that runs parallel to Cedar Avenue and perpendicular to East Ohio Street.

2

along Cedar Avenue and 11.33 feet of frontage along Moravian Way; and Lot 5, covering 1886 square feet, would have 15.6 feet of frontage along Cedar Avenue and 20.67 feet of frontage along Moravian Way. (FOF ¶¶ 1-6.)

### B. Proceedings Before the Commission

On April 17, 2018, the Commission held a public hearing, at which the City's Zoning Administrator set forth the Plan's details, advised the Commission of the status of related zoning proceedings reflecting that some of the relief had been granted and the other was pending before the City's Zoning Board of Adjustment (ZBA), and indicated that the City's staff recommended approval of the Plan. (R.R. at 143.) Nathan Hart, East Ohio Capital's architect, explained the Plan and the need to incorporate the 5.6-foot strip of land into Lot 1 to enable safe access to and from the rear and interior of Lot 1's buildings and to allow East Ohio Capital to incorporate rear-facing windows into the apartments it was reconstructing. (*Id.* at 147-49.) According to Mr. Hart, the incorporation of the strip of land was important because it would provide emergency access to the rear of Lot 1, which is "a significant life safety feature," as well as to provide a secondary way of egress for the apartments. (*Id.* at 148.) Part of the Plan, Mr. Hart testified, was to construct detached garages for the single-family residences on Lots 2 through 5, which had been rental properties and were "run down." (*Id.* at 149.) Art Perkins, representing East Allegheny Community Council (Community Council), a local organization, spoke in favor of the Plan, stating that Community Council's members believed that it would benefit the area. (*Id.* at 150-51.) He explained that the prior owner or landlord of the Lots "was quite negligent," the Lots "had been nuisance properties," and the neighborhood wanted the project to move forward. (*Id.* at 151.) Mr. Perkins submitted a letter from Community

3

Council, reflecting its members' unanimous support of the Plan. (*Id.* at 35.) Pictures, both current and historic, reflecting the condition of the parcels were offered. (*Id.* at 39-44.)

Prior to the hearing, Objectors, who own properties on Cedar Avenue, submitted letters to the Commission, expressing their opposition to the Plan. Mr. Gates indicated he "fully support[ed] the uniting of the front and rear lots and proper separation of the adjoined houses along Cedar Avenue," but felt that it was premature for the Commission to consider the Plan, as he believed that more community input and governmental review was necessary in order to properly understand the Plan's potential long-term effects. (*Id.* at 93-96.) In addition, Mr. Gates believed that if the Plan was approved, it would "usurp" residentially zoned land for commercial use, complicate future legal action against the owners of the properties, and diminish the size of the adjacent Deutschtown Historic District (Historic District). (*Id.*) Mr. Pascal reiterated Mr. Gates's concerns about the Plan's impact upon the Historic District, as well as about using residentially zoned land for commercial purposes, while also averring that the 11.3 feet of frontage along Moravian Way for each of Lots 2 through 5 was too narrow to allow vehicles to easily maneuver. (*Id.* at 97-98.) During the hearing, Mr. Gates submitted an additional letter and reiterated the arguments from his prior letter to the Commission, noting that no one had seen any interior plans regarding the proposed renovations. (*Id.* at 14-19, 152-53.) He believed that existing commercial businesses on East Ohio Street rose to the challenge of the limitations on deliveries due to their location along East Ohio Street and there was no need for the Plan to be approved to reduce the challenges to Lot 1 by incorporating the strip of land to allow for rear deliveries. (*Id.* at 153.) Mr. Pascal did not attend the hearing.

4

At the end of the hearing, the Commission approved the Plan four to zero by voice vote, with one member abstaining, but did not issue a written decision. Objectors appealed to common pleas, which remanded to the Commission for it to render a written decision in support of its grant of the Plan. The Commission issued a written decision, in which it set forth findings regarding the Plan's purpose, the proposed new dimensions of Lots 1 through 5, and an explanation of the existing structures on the Lots and the Lots' zoning. (FOF ¶¶ 1-8.) In addition, it found that the ZBA had granted the variances necessary to revise the boundaries of Lots 2 through 5, located on Cedar Avenue, and the construction of detached garages on those properties. (*Id.* ¶ 9.) The Commission found that the zoning relief for Lot 1 was pending before the ZBA. (*Id.* ¶ 10.) The Commission's findings noted Mr. Pascal's and Mr. Gates's opposition to the Plan's approval. (*Id.* ¶¶ 11-12.)

The Commission then set forth its conclusions of law relating to its approval of the Plan. It held that the Plan did not change the underlying zoning or historic designation of the Lots, as Objectors suggested. (Comm'n Decision, Conclusion of Law (COL) ¶ 1.) Further, the Commission concluded that the Plan's changes kept the general character of the surrounding neighborhood, as defined in Section 1.1 of the City's Subdivision Regulations,[4] and would not cause negative impacts on the neighborhood. (*Id.* ¶ 2.) The Commission held that the Plan would "not impact the provision of adequate light, air, and privacy and will not cause undue

---

[4] Section 1.1 of the Subdivision Regulations explains the purpose of those regulations, including "to promote quality growth and development" through "the retention and enhancement of the Pittsburgh Character," and sets forth various considerations for review by the Commission in approving a subdivision plan. Subdivision Regulations, § 1.1.

5

overcrowding or congestion." (*Id.* ¶ 3.) Based on "these reasons and the applicable legal standards," the Commission approved the Plan. (*Id.* ¶ 4.)

### C. Objectors' Second Appeal to Common Pleas

Objectors again appealed to common pleas, challenging the Plan's approval. Before common pleas, Objectors first argued that the Commission erred because the Plan had not been submitted and reviewed in compliance with the requirements for developing major subdivisions, as set forth in the Subdivision Regulations. (R.R. at 188-91.) In addition, Objectors asserted that several of the Conclusions of Law were not supported by substantial evidence, including that the Plan would not alter the affected properties' zoning or historical designations; the Plan would not negatively impact the surrounding neighborhood; the Plan was harmonious with the general character of the surrounding neighborhood, in keeping with Subdivision Regulation § 1.1; and the Plan would not "impact the provision of adequate light, air, and privacy [or] cause undue overcrowding or congestion." (*Id.* at 191-98.) Objectors next argued that the Plan was not in the necessary state of "complete compliance" with the Zoning Code of the City of Pittsburgh, Pennsylvania (Zoning Code), as the Plan violated the Zoning Code's requirements regarding floor area ratio, loading zones, parking spaces, and restaurant facilities. (*Id.* at 198-200.) Finally, Objectors contended that one of the commissioners who voted to approve the Plan, LaShawn Burton-Faulk, had a conflict of interest because she was also a member of the NLC's board of directors at the time of her vote. (*Id.* at 200-01.)

Without taking additional evidence and upon consideration of the parties' briefs and oral argument, common pleas issued an opinion and order affirming the Commission's approval of the Plan. Common pleas held that East Ohio Capital's

6

evidence established that the Plan would allow for an access lane for Lot 1, provide the apartments located on Lot 1 with rear windows, and allow the construction of garages to serve the single-family homes on Lots 2 through 5, which are dilapidated and in need of renovation. (*Id.* at 221-22.) Further, pointing to Mr. Perkin's testimony, common pleas explained that the community supported the Plan. (*Id.* at 221.) Reviewing the Commission's conclusions of law, common pleas held the Commission's approval was not erroneous because the "Commission confirmed that the consolidation does not alter the Historic[] District" because only the "Council of the City of Pittsburgh has the power to alter historic[] designations." (*Id.* at 222-23.) As to Objectors' argument that the consolidation resulted in a partial rezoning, common pleas observed that none of the parties had submitted a proposal to City Council for rezoning and no hearing or vote on such a change had occurred and, therefore, the Commission properly held no change in zoning resulted from the Plan's approval. (*Id.* at 223.) Common pleas held the Commission found there would be no negative impact on the neighborhood, which was supported because the proposed consolidation and development would rehabilitate dilapidated properties and improve the area. (*Id.*) Finally, common pleas held, as the Commission had, that approving the Plan was not contrary to the City's Subdivision Regulations, the purpose of which is to "promote quality growth and development . . . by the retention and enhancement of the 'Pittsburgh Character,' as defined by its rivers, hillsides, open spaces, unique architecture, neighborhoods and other important physical images." (*Id.* (quoting Section 1.1 of the Subdivision Regulations).) Common pleas explained "[t]here is no evidence in the record of any detriment to the community resulting from the consolidation" and "the consolidation would aid in the rehabilitation of several

dilapidated properties and would improve the neighborhood." (*Id.*) Therefore, common pleas held the Commission's approval was proper and dismissed Objectors' appeal. Objectors now appeal to this Court.[5]

## II. Discussion

On appeal,[6] Objectors argue the Plan does not comply, either procedurally or substantively, with the Subdivision Regulations for numerous reasons. Further, Objectors argue the Commission's Decision effectively rezoned the affected properties and altered the area contained within the Historic District. Finally, Objectors argue that Commissioner Burton-Faulk should have recused herself from the proceedings due to her position as a board member of NLC, the entity that owned some of the parcels at issue, which created a conflict of interest that requires reversal. We will address these arguments in turn.[7]

---

[5] "Where, as here, a trial court takes no additional evidence, our scope of review is limited to determining whether the Planning Commission abused its discretion or committed an error of law." *Oakland Planning & Dev. Corp. v. City of Pittsburgh Planning Comm'n*, 107 A.3d 873, 881 (Pa. Cmwlth. 2015). "An abuse of discretion is established where the findings are not supported by substantial evidence. . . . Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Collier Stone Co. v. Twp. of Collier Bd. of Comm'rs*, 735 A.2d 768, 772 n.9 (Pa. Cmwlth. 1999) (internal citation omitted).

[6] Common pleas did not direct Objectors to file a Concise Statement of Errors Complained of on Appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(b).

[7] The Concurring and Dissenting Opinion would not address Objectors' arguments on appeal for two reasons. First, it would find, *sua sponte*, that many of Objectors' arguments are waived for having not preserved them at all stages of the proceedings. It is well settled that courts may not raise an issue *sua sponte* except when the issue goes to the courts' subject matter jurisdiction. *Russell Minerals Fayette, Inc. v. Zoning Hearing Bd. of Fayette Cty.*, 634 A.2d 836, 838 n.1 (Pa. Cmwlth. 1993). Nonetheless, citing *Commonwealth v. Butler*, 812 A.2d 631, 633 (Pa. 2002), the Concurring and Dissenting Opinion attempts to analogize the situation in this case to the "automatic" waiver set forth in Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b), when an appellant fails to comply with a Rule 1925(a) order. Such an analogy is not warranted in this case. There was no Rule 1925(a) Order issued in this case, so **(Footnote continued on next page…)**

*A. Whether the Plan's Submission Complied with the Subdivision Regulations' Procedural Requirements.*

Objectors argue the Plan qualifies as a major subdivision plan under Section 4.14 of the Subdivision Regulations because it proposes to consolidate properties that are located in the Historic District, which qualifies as a "Site of Special Interest." For support, they cite language in Section 4.14 that references areas that contain "historic features" as meaning that their historic neighborhood is a Site of Special Interest. Therefore, Objectors argue, the Plan's submission was required to comply with the requirements for a major subdivision, including the submission of a sketch plat, a preliminary subdivision plan, and a final subdivision plan to the Zoning Administrator for review, and East Ohio Capital submitted only one plan.

---

**(continued…)**

Rule 1925 is not applicable, and there is no authority that would extend the bright line waiver set forth in the text of Rule 1925 to general cases of issue preservation. Thus, *Butler*, in which Rule 1925 applied, is inapposite and the waiver the Concurring and Dissenting Opinion would find is not "that kind of waiver," *Gates v. City of Pittsburgh Planning Commission* (Pa. Cmwlth., No. 495 C.D. 2019, filed June 12, 2020) (Ceisler, J., concurring and dissenting), slip op. at 2.

Second, the Concurring and Dissenting Opinion would not address Objectors' preserved issue because it would find that the Commission's Decision is inadequate and prevents the Court from performing proper appellate review; thus, that Opinion would vacate and remand for a new decision. Although the Concurring and Dissenting Opinion acknowledges that the Commission's Decision's factual findings are "objectively accurate," it states that these findings "shed no light on how the . . . Commission arrived at its . . . broadly worded conclusions of law." *Gates*, (Ceisler, J., concurring and dissenting), slip op. at 5. However, the Commission's Decision includes findings of fact and conclusions of law that explain why it approved the Plan. And, while the Commission did not make express credibility determinations, given the limited amount of evidence, it is apparent that the Commission credited the evidence that supported the Plan's approval and did not credit Objectors' evidence attempting to establish that the Plan would be detrimental to the neighborhood. As the Court stated in *Fisler v. State System of Higher Education, California University of Pennsylvania*, 78 A.3d 30, 44 (Pa. Cmwlth. 2013), "where the [] decision itself implicitly provides a clear indication of which witnesses [were] credited" explicit credibility determinations are not required. Finally, none of the parties have argued that their ability to make arguments on appeal have been hindered by the Commission's Decision. For these reasons, the Commission's Decision is sufficient to allow this Court to perform appellate review.

9

Objectors further assert that, even if the Plan is a minor subdivision, the Plan's submission did not comply with minor subdivision requirements because East Ohio Capital did not submit an application or a sketch plat to the Zoning Administrator.

The City and East Ohio Capital respond that the Plan is not located in a Site of Special Interest and does not otherwise meet the standard for a major subdivision. They note that Section 4.14 of the Subdivision Regulations identifies particular districts within the City that qualify as Sites of Special Interest, and the properties here are not within one of those districts. The City and East Ohio Capital further argue that the Plan complied with the minor subdivision requirements because the Plan was presented to City officials, who recommended its approval, and the Plan submitted contained all of the elements of a sketch plan.

Reviewing the Subdivision Regulations, the Plan is not a major subdivision, contrary to Objectors' contention, because it does not involve new construction that creates 10 or more lots, does not subdivide more than 500,000 square feet of land, and does not subdivide within a "Site of Special Interest." *See* Section 2.7 of the Subdivision Regulations. Section 2.7 of the Subdivision Regulations defines "Major Subdivision" as

> a subdivision where the majority of any development is new construction and which involves the creation of ten (10) or more lots or the subdivision of more than 50,000 square feet of land, or a subdivision within a Site of Special Interest, as provided in Section 4.14, provided the subdivision is not located within a Planned Development District.

Subdivision Regulations, § 2.7. Objectors contend the Plan affects a "Site of Special Interest," because they read the first paragraph of Section 4.14 of the Subdivision Regulations as describing, generally, the requirements for an area to

10

receive that designation.  However, to be a "Site of Special Interest" requires a designation and it appears only three specific districts have been so designated.  The properties at issue are not located in any of those districts.  Section 4.14 provides

> **The following areas of the City shall be designated as "Sites of Special Interest" by the Planning Commission.**  An area shall receive such designation if it is an area of City-wide public importance, with a character that is unique to the City, based on its architectural, natural, cultural, or historical features, and therefore substantially contributes to the "Pittsburgh Character" as defined in Section 1.1.
>
> Any subdivision within a Site of Special Interest shall be considered a Major Subdivision, as defined in Section 2.7, and shall follow the procedures for major subdivision outlined in Section 3.0.
>
> > 4.14.1 Oakland Institutional-Civil District
> >
> > 4.14.2 All lots abutting Grandview Avenue
> >
> > 4.14.3 That area bounded by Fifth Avenue on the north, Shady Avenue on the east, Wilkins Avenue on the south, and Murray Hill Avenue on the west.

Subdivision Regulations, § 4.14 (emphasis added).  Accordingly, the Plan does not involve a major subdivision.

The minor subdivision requirements apply here, and the Plan meets those requirements.  Per Sections 3.0 and 3.1 of the Subdivision Regulations, a minor subdivision requires the filing of an application with the Zoning Administrator, the submission of a sketch plat, and a final subdivision plan.  Subdivision Regulations, §§ 3.0, 3.1.  Although Objectors contend East Ohio Capital did not file an application with the Zoning Administrator, it is apparent from the record that East Ohio Capital filed its plan with the Zoning Administrator because he testified as to

11

its submission and review by City staff, resulting in its recommended approval. Further, a sketch plat "is a drawing, or map, which may be freehand, which illustrates the applicant's plan for a proposed subdivision, and which is submitted to the Zoning Administrator for approval" and "shall contain that information required in the Subdivision Site Plan." Subdivision Regulations, § 2.17.2. A "Subdivision Site Plan is a drawing or map" "illustrat[ing] precisely the lot or lots to be subdivided and all land within one hundred (100) feet of the proposed subdivision area." Subdivision Regulation, § 2.27. This plan is to include information regarding the location of buildings, roads, utility easements, open space, natural features on the site, natural water courses or drainage areas, large trees, and building setback lines. *Id.* The detailed Plan East Ohio Capital submitted to the City officials contained the relevant requirements of a sketch plan, given the already developed nature of the Lots, and allowed City officials to review the Plan. (R.R. at 165.) Finally, to the extent that Objectors argue the Plan did not show "a detailed description" of the "proposed uses and magnitude of development," as is required by Section 2.25 of the Subdivision Regulations, the Plan involves the consolidation of existing lots on which existing structures are located, the use of which is not changing, and then resubdividing them into different sized lots. Lots 2 through 5 will continue to be single-family residences, and Lot 1 will continue to be for commercial and apartment use. Therefore, these are not reasons to reverse.

*B. Whether the Plan Complied with the Subdivision Regulations' Substantive Requirements.*

Objectors next argue East Ohio Capital did not meet the criteria for the Plan's approval because it did not establish: the public use or interests to be served by the Plan; how the Plan would enhance the "Pittsburgh Character" of the

12

neighborhood; or what the impacts would be on the public health, safety and general welfare of the neighborhood, particularly issues of congestion and privacy related to an increase in the number of apartments on Lot 1. They maintain the Commission was obligated to question East Ohio Capital regarding these factors and did not. Objectors also argue the only evidence regarding the impact of the Plan was their own, which showed that the Plan did not meet the requisite criteria for approval because there would be increased traffic and congestion. Objectors further assert the Plan is not in complete compliance with the Zoning Code because it does not provide all of the parking spaces required by the Zoning Code.

The City responds that Objectors' arguments are based on their own interpretation of what "Pittsburgh Character" means and that Objectors did not present evidence of detriment to the neighborhood beyond their own speculations. According to the City, the approval of the Plan allows for the rehabilitation of dilapidated properties and for emergency access to the rear of Lot 1. The City points out that the Plan was supported by Community Council, showing that the consolidation of the Lots retained the "Pittsburgh Character" in accordance with the Subdivision Regulations. East Ohio Capital argues its Plan met the requirement for approval because it demonstrated that the Plan would, among other things, rehabilitate nuisance and run-down properties, and provide for emergency access and an additional access point to the rear of the structure on Lot 1. Such changes, it asserts, improves the public health and safety for the tenants and area.

Section 1.1 of the Subdivision Regulations states:

> The purpose of these Subdivision Regulations is to promote quality growth and development in the City of Pittsburgh, by the retention and enhancement of the "Pittsburgh Character," as defined by its rivers, hillsides, open spaces, unique architecture, neighborhoods and other important physical images. In concert with the City's Zoning

13

Ordinance, the Long Range General Land Use Plan, area plans and various plans and policy documents adopted from time to time by the Planning Commission, these regulations are intended:

1.1.1 To provide for adequate light, air, and privacy, to secure safety from fire, flood, landslides and other danger, and to prevent overcrowding of the land and undue congestion of population.

1.1.2 To protect all areas of the City and their character the social and economic stability of all land, and to minimize the conflicts among the uses of land and structures.

1.1.3 To guide public and private policy and action in order to provide adequate and efficient transportation, water, sewerage, schools, parks, playgrounds, recreation, and other public requirements and facilities.

1.1.4 To provide the most beneficial relationship between the uses of land and the circulation of people and vehicles throughout the City, having particular regard to the avoidance of pedestrian and vehicular congestion, the pedestrian traffic movements appropriate to the various uses of land and structures, and to provide for the proper location and width of streets.

1.1.5 To establish reasonable standards of design and procedures for subdivisions and resubdivisions, in order to further the orderly layout and use of land; and to insure proper legal descriptions and monumentation of subdivided land.

1.1.6 To insure that public facilities are available and will have a sufficient capacity to serve the proposed subdivision.

Subdivision Regulations, § 1.1.  Sections 3.7 and 3.9 set forth the requirements for the Commission's review of subdivision plans.  Section 3.7.2 provides

The Commission shall inquire as to the public use and interest proposed to be served by the establishment of the subdivision.  It shall consider all relevant facts to determine whether the public interest will be served by the subdivision and if it finds that the proposed subdivision plan makes appropriate provisions for the public health, safety and general welfare and for open spaces, streets and drives, water supply, sanitary wastes, fire protection, playgrounds, school

sites, and other important public facilities, and that the subdivision promotes the enhancement of the "Pittsburgh Character" as defined by Section 1.1 of these regulations, then it shall approve the proposed Subdivision Plan.

Subdivision Regulations, § 3.7.2. Section 3.7.3 states that "[i]f any of the above findings are not made, then the Commission shall disapprove the subdivision, or shall approve the subdivision with modifications or conditions based on the provisions of these regulations." Subdivision Regulations, § 3.7.3. Section 3.9.4 of the Subdivision Regulations limit approval only to those plans that "are found to be in complete compliance with the provisions of the" Zoning Code. Subdivision Regulation, § 3.9.4.

We first address Objectors' argument that the Plan does not completely comply with the Zoning Code. Issues relating to the Plan's compliance with the Zoning Code are not within the Commission's jurisdiction. *See Rickert v. Latimore Township*, 960 A.2d 912, 918-19 (Pa. Cmwlth. 2008) (holding that approval of a subdivision plan "relates only to subdivision and land development matters and not to zoning matters" and approval of the one "does not extend to any zoning approvals needed to effect the development"). Here, the Commission acknowledged that other approvals had been obtained or were being considered. (FOF ¶¶ 9-10.) As such, it did not err or abuse its discretion in approving the Plan despite the ongoing proceedings before other administrative authorities. Notably, this Court recently addressed, and rejected, Objectors' challenge to the ZBA's ultimate grant of zoning relief to Lot 1 in *Pascal v. City of Pittsburgh Zoning Board of Adjustment* (Pa. Cmwlth., No. 496 C.D. 2019, filed February 28, 2020). Thus, this is not a reason to reverse the Commission's Decision.

15

We now turn to Objectors' other arguments for why the Plan did not comply with the Subdivision Regulation's substantive provisions, which focus on the detrimental impact to the neighborhood they believe will be caused by the Plan's approval and the fact that the Plan does not promote the enhancement of the area's "Pittsburgh Character." East Ohio Capital presented evidence that supports the Commission's Decision that the Plan met the necessary requirements for approval. East Ohio Capital offered the Plan itself, which showed via drawings the specific changes proposed to consolidate the parcels. (R.R. at 165.) Mr. Hart testified that the consolidation would create access to the rear of Lot 1 to allow for deliveries, emergency and secondary egress points where none had been before, the addition of rear windows to the apartments on that parcel, and garages for the existing single-family homes on Lots 2 through 5, which had been rentals and were in run-down condition. (*Id.* at 147-49.) On this latter point, Mr. Gates's letter reflected that he actually supported the consolidation of the front and rear lots on Lots 2 through 5 because it would allow the single-family homes to have alley access. (*Id.* at 12.) Mr. Perkins, on behalf of Community Council, testified that the properties being consolidated had become nuisances due to the prior owner's negligence and the organization wanted the Plan to move forward. (*Id.* at 150-51.) The letter submitted on behalf of Community Council reflects its members' decision to support the Plan's approval was unanimous. (*Id.* at 35.) In addition, photographs showing the poor condition of the properties were presented. (*Id.* at 39-44.) In response, Objectors did not present any specific evidence establishing detriment to the community, only **generalized** concerns regarding potential congestion of an adjacent alleyway, increased traffic, and a reduction in parking. *See Morris v. S. Coventry Twp. Bd. of Supervisors*, 836 A.2d 1015, 1025 (Pa.

16

Cmwlth. 2003) (holding that a local agency is without power to deny subdivision approval based upon generalized concerns).

Ultimately, in approving the Plan, the Commission implicitly credited East Ohio Capital's evidence and rejected Objectors' contrary evidence. Ohio Capital's evidence supports the Commission's determination because it showed that the Plan would not cause a negative impact on the neighborhood where the Plan allowed for the rehabilitation of properties that had become dilapidated and nuisances. (R.R. at 40-44, 151). The lack of negative impact is reflected by Community Council's unanimous support of the Plan and, at least as to the consolidation of Lots 2 through 5, in Mr. Gates's letter to the Commission. Further, the evidence and unanimous approval of the Plan by Community Council supports the Commission's determination that the Plan promotes or enhances the area's "Pittsburgh Character." Although Objectors are disappointed that the Commission did not accept their evidence or their version of what "Pittsburgh Character" means, this does not require reversal of the Commission's Decision.

For these reasons, we discern no error or abuse of discretion by the Commission in finding that the Plan met the substantive requirements for approval.

*C. Whether the Plan's Approval Rezoned and Removed Property from the Historic District.*

Objectors argue that the Plan's approval effectively rezoned the strip of land consolidated into Lot 1 from R1A-VH to LNC. This rezoning, they assert, improperly converts residential land to commercial use by using the strip of land to provide access to the rear of Lot 1. This consolidation, Objectors argue, is contrary to the purpose of the LNC District, which is to promote and enhance the quality of life of adjacent residential districts. Objectors further assert that the Plan improperly expands a "nonresidential nonconforming structure" in violation of the

17

Zoning Code. (Objectors' Brief at 25.) Similarly, Objectors maintain that consolidating the strip of land, which is located in the Historic District, into Lot 1 alters the historic designations of the properties. The City and East Ohio Capital argue that the approval of the Plan's lot consolidation does not rezone or change the historic designations because no application to alter the zoning or Historic District was filed, and the Commission does not have the authority to make such changes.

Reviewing the City's regulations, the authority to change zoning or historic designations within the City lies with entities other than the Commission. Per Section 922.05.E of the Zoning Code, applications to amend the boundaries of the City's Zoning Map are presented to and approved by City Council, not the Commission. City of Pittsburgh Zoning Code, § 922.05.E. Further, it is City Council that has the authority to designate historic districts per Section 1101.03(a) of Title 11 of the City of Pittsburgh, Pennsylvania, Code of Ordinances (Historic Preservation Code). Historic Preservation Code, § 1101.03(a). Thus, the Commission's approval of the Plan cannot alter the existing zoning and historical designations, which remain the same as they were before the Plan's approval, as determined by the Commission. Accordingly, these are not reasons to reverse the Commission's Decision.

*D. Whether Commissioner Burton-Faulk's Vote Requires Reversal.*

Last, Objectors argue that Commissioner Burton-Faulk had a conflict of interest and should not have heard, participated, or voted on the Plan because, at that time, she was on the board of directors for NLC. Objectors assert that, because of this apparent conflict of interest, Commissioner Burton-Faulk should have recused from the proceedings and her failure to do so requires that the

18

Commission's Decision be reversed. The City argues Objectors waived this argument by not raising it before the Commission and did not present evidence demonstrating any conflict of interest. Both the City and East Ohio Capital assert that reversal is not required because Commissioner Burton-Faulk's vote was not outcome determinative where the vote was four to zero with one abstention.

This Court has held that

[t]he general rule is that a municipal officer should disqualify [her]self from any proceeding in which [s]he has a personal or pecuniary interest that is immediate and direct. . . . Our Supreme Court has also found that an impermissible commingling of adjudicatory and prosecutorial functions occurred when a zoning hearing board was advised by a solicitor who was also representing the township in the same proceeding. *Horn v. Township of Hilltown*, . . . 337 A.2d 858 ([Pa.] 1975). There it was held that actual prejudice to the rights of a party need not be shown to exist but that in order to fulfill its duties properly "a government body charged with certain decision[-]making functions . . . must avoid the *appearance of possible prejudice*, be it from its members or from those who advise it or represent parties before it." *Id.* at . . . 860 (emphasis added).

*Borough of Youngsville v. Zoning Hearing Bd. of Borough of Youngsville*, 450 A.2d 1086, 1090-91 (Pa. Cmwlth. 1982) (internal citation omitted). Although Objectors claim that Commissioner Burton-Faulk's participation in this matter may give the appearance of possible prejudice, such that she should have been disqualified, her potential disqualification does not require the reversal of the Commission's Decision. In *Borough of Youngsville*, we explained that

[d]isqualification of [a] member . . . does not in and of itself require a reversal of the decision that was reached []. There has been no allegation that the member in question controlled or unduly influenced the other members . . . in any manner which would raise doubts as to the validity of *their* votes.

19

*Id.* at 1091. Here, the Commission voted four to zero with one abstention to approve the Plan, and there are no allegations that Commissioner Burton-Faulk controlled or unduly influenced the other Commission members. Accordingly, her potential disqualification does not require that we reverse the Commission's Decision.

## III. Conclusion

For the foregoing reasons, we discern no error or abuse of discretion in the Commission's approval of the Plan. Accordingly, we affirm.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chris Gates and Stephen Pascal,      :
                Appellants      :
                                 :
              v.              :    No. 495 C.D. 2019
                                 :
City of Pittsburgh Planning           :
Commission, City of Pittsburgh and    :
East Ohio Capital Group, and East      :
Ohio Capital LLC                :

# O R D E R

**NOW**, June 12, 2020, the Order of the Court of Common Pleas of Allegheny County is **AFFIRMED**.

 

_____

**RENÉE COHN JUBELIRER,** Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chris Gates and Stephen Pascal, : 
                   Appellants :
                              :
                              :
         v.                   : No. 495 C.D. 2019
                              : ARGUED: October 3, 2019
                              :
City of Pittsburgh Planning    :
Commission, City of Pittsburgh and :
East Ohio Capital Group, and East :
Ohio Capital LLC               :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

CONCURRING AND DISSENTING OPINION
BY JUDGE CEISLER                          FILED: June 12, 2020

Though I agree, to a certain extent, with the outcome created through the majority's opinion in this matter, I take issue with the majority's reasoning and, therefore, concur in the result in part and dissent in part.

First, I agree with the majority that Appellants Chris Gates and Stephen Pascal (Appellants) are not entitled to relief regarding their claims that: Appellee East Ohio Capital LLC's proposed lot consolidation and subdivision plan (Plan) did not comply with Appellee the City of Pittsburgh's (City) Subdivision Regulations' requirements for major subdivisions; the Plan did not completely comply with the City's Zoning Code requirements regarding floor area ratio, loading zones, parking spaces, and restaurant facilities; and one of the City's Planning Commission commissioners who voted to approve the Plan, LaShawn Burton-Faulk, had a conflict of interest because she was also a board member of the Northside Leadership Conference at the time of her vote.

However, unlike the majority, which reaches the merits of these claims, I would deem them to have been waived by Appellants. The Pennsylvania Rules of Appellate Procedure establish that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa. R.A.P. 302(a). As Appellants did not previously attack the Plan's alleged noncompliance with the Zoning Code's minor subdivision requirements, they have not preserved that issue for our review.

In addition, Section 753(a) of the Local Agency Law,[1] which governs the statutory appeal process for decisions issued by the Planning Commission, states in relevant part that "if a full and complete record of the proceedings before the agency was made[, an appellant] may not raise . . . any other question not raised before the agency (notwithstanding the fact that the agency may not be competent to resolve such question) unless allowed by the court upon due cause shown." 2 Pa. C.S. § 753(a). The Court of Common Pleas of Allegheny County (Trial Court) did not address whether Appellants had waived any of the issues they sought to raise, nor did any of the opposing parties challenge Appellants' statutory appeal on the basis of waiver.

However, I believe we must *sua sponte* consider whether Appellants waived any such issues. This scenario is analogous to those involving an appellant's waiver of an issue for failure to mention it in their Pa. R.A.P. 1925(b) statement. Our Supreme Court has held that kind of waiver to be "automatic" and, thus, one which may considered by a court on its own initiative. *Com. v. Butler*, 812 A.2d 631, 633 (Pa. 2002); *see* Pa. R.A.P. 1925(b)(vii) ("Issues not included in the [s]tatement of errors complained of on appeal and/or not raised in accordance with the provisions of [Pa. R.A.P. 1925(b)(4)] are waived."). Like Pa. R.A.P. 1925(b)(4)(vii), Section

---

[1] 2 Pa. C.S. §§ 551-55, 751-54.

753(a) of the Local Agency Law places the burden on an appellant to broach their issues at the proper juncture, *with a failure to do so explicitly penalized by a prohibition against raising any other, previously unarticulated or inconsistently expressed concerns at a later point*. 2 Pa. C.S. § 753(a). Thus, we are obligated under the circumstances to determine whether Appellants properly preserved all of the issues they present for our consideration, regardless of whether the opposing parties themselves claim that waiver has occurred. To do otherwise would ignore the dictates of both the Local Agency Law and the Pennsylvania Rules of Appellate Procedure, as well as undermine one of the central tenets of appellate review by allowing us to address questions of law and fact that were not considered by the inferior bodies that first handled this matter.[2]

When Appellants registered their opposition to the Plan before the Planning Commission, they did not mention the Plan's alleged noncompliance with the Subdivision Regulations' requirements for major subdivisions, the Plan's putative lack of "complete compliance" with the Zoning Code, or Commissioner Burton-Faulk's alleged conflict of interest. Furthermore, Appellants never sought leave from the Trial Court to address these new issues during the course of their statutory appeal and, instead, brought them up without even attempting to explain why they had not first done so in front of the Planning Commission. Therefore, I would hold that Appellants have waived each of these issues, as they did not raise them at the Planning Commission level and subsequently failed to make a showing of good cause before the Trial Court.

---

[2] The City does claim that Appellants waived their conflict of interest argument by failing to raise it before either the Commission or the Trial Court. City's Br. at 26. However, Appellants did make this argument in the Brief they submitted to the Trial Court.

As for Appellants' remaining argument, through which they allege that several of the Planning Commission's conclusions of law are not supported by substantial evidence, I would conclude that we are prevented from conducting proper appellate review, due to the manifest inadequacies of the Planning Commission's October 12, 2018 Decision. The City's Subdivision Regulations establish the following standard for approving or disapproving subdivision plans:

> The [Planning] Commission shall inquire as to the public use and interest proposed to be served by the establishment of the subdivision. It shall consider all relevant facts to determine whether the public interest will be served by the subdivision and if it finds that the proposed subdivision plan makes appropriate provision for the public health, safety and general welfare and for open spaces, drainage, streets and drives, water supply, sanitary wastes, fire protection, playgrounds, school sites, and other important public facilities, and that the subdivision promotes the enhancement of the "Pittsburgh Character" as defined in Section 1.1 of these [Subdivision R]egulations, then it shall approve the proposed . . . Subdivision Plan.

Subdivision Regulations § 3.7.2; *see id.*, § 3.9.1. "If any of the above findings are not made, then the [Planning] Commission shall disapprove the subdivision, or shall approve the subdivision with modifications or conditions based upon the provisions of these [Subdivision R]egulations." *Id.*, § 3.7.3; *see id.*, § 3.9.2. The burden is thus on the applicant to prove to the Planning Commission's satisfaction that a subdivision plan comports with these requirements. In addition, Section 555 of the Local Agency Law states: "All adjudications of a local agency shall be in writing, *shall contain findings and the reasons for the adjudication*, and shall be served upon all parties or their counsel personally, or by mail." 2 Pa. C.S. § 555 (emphasis added). Despite this plain language from both the Local Agency Law and the Subdivision Regulations, the Planning Commission's Decision contains nothing more than

factual statements which, however objectively accurate they may be, shed no light on how the Planning Commission arrived at its aforementioned, broadly worded conclusions of law. Indeed, rather than explaining, in any meaningful way, its determination that the Plan satisfies the Subdivisions Regulations' aforementioned requirements, the Planning Commission simply jumps from briefly discussing the Plan and Appellants' opposition thereto to flatly stating that approval of the Plan is warranted. This is wholly inadequate, regardless of how slim this matter's evidentiary record may be, or how short the Planning Commission's hearing on the Plan may have been.

Therefore, I dissent to the extent that the majority determines that the Planning Commission's findings of fact and conclusions of law are legally adequate. Instead, I would vacate the Trial Court's March 27, 2019 order and remand to the Trial Court, with instructions that it once again remand this matter so that the Commission can make proper, sufficiently detailed findings of fact and conclusions of law.

_____
ELLEN CEISLER, Judge